The opinion of the court was delivered by
McEnery, J.
On April 3, 1892, the Fire Proof Cotton Press was destroyed by lire in the city of New Orleans. The fire extended to-the Orleans Cotton Press, which, with its contents, was also destroyed. This suit was instituted by the officers of the Orleans Press to recover the value of the cotton burned in their press. They aver *1181 that the ñre. originated from sparks emitted from an engine owned and controlled by defendants while passing a pile of cotton bales on the banquette alongside of the Fire Proof Press; that the sparks emitted from the engine were due to the negligence of the defendant in the construction arid operation of the engine and to the defectiveness of the track at the point at which the sparks were emitted from the engine.
For the origin of the fire and the defectiveness of the track upon which the engine jolted, thus, according to plaintiffs’ theory, causing the sudden energy which made the engine emit the sparks, the plaintiffs relying upon the testimony of one Ballard, which it claimed was corroborated by a number of witnesses.
We might, upon authority, dispose of this case, by saying that the testimony satisfies us that the defendant company’s engine was properly equipped with all necessary appliances in good order for the arrest of sparks caused by the particular fuel which the company used in the fire box of the engine. Elsewhere there are others, and, it may be, safer appliances used, but they have not been adopted by all roads, being used principally by the Pennsylvania Central. At any rate it is shown that different roads use differently constructed engines, with difference in size of meshes in the wire netting, and we presume that each road equips its engines according to the services it is destined to perform. We are of the ■opinion that for all practical purposes engine No. 109, which it is claimed emitted the sparks, was properly and effectively constructed and equipped for the arrest of sparks from the burning of anthracite coal — the fuel which was used in the service of the engine. We had a view of the “ spark arrester ” used in this engine, and we are convinced that sparks of insignificant size could only be emitted under the most favorable circumstances.
We understand from expert testimony that anthracite coal makes no smoke, but emits from the smoke-stack a light blue vapor; that the engine using it throws out fewer sparks and of a different shape than when soft coal is burned. The sparks from hard-coal burning •engines are, as a general rule, flakes of coal in a greater or less ■degree of combustion, and contain less heat than the sparks from soft coal. The sparks that pass through the netting are broken and contain little heat. They live but a short distance in the air — say not more than thirty or forty feet.
*1182 The witness Ballard says but few sparks were emitted from the' smoke-stack of engine No. 109, and they were the size of his little-finger. No sparks of this size could have been projected through, the netting with which it was equipped, unless the netting was in bad condition. The testimony is uncontradicted that the netting was in perfect condition.
Locomotive No. 109 was built by the Brooks Locomotive Works,, which is one of the largest works of the kind in the United States. This locomotive was designed by John Plair, the mechanical engineer of the establishment. That he is able and competentis evident from the fact of his employment by such an establishment. His testimony is important because it rests not alone upon theory, but from observation also. He says it is not possible to construct a locomotive-that will not emit some sparks, but they are generally dead before they ascend to any appreciable distance and begin to fall. No. 109’ locomotive was designed for “ diamond stack ” to use No. 12 wire with 234x2)4 mesh. For the extension locomotive the general practice is to use the 2>4x2 J4 mesh with No. 12 wire, and for the diamond stack 33áx3 >¿ and No. 18 wire. Extension fronts have been in use-twelve or thirteen years, and were introduced by the Pennsylvania Road, with which he was connected when they developed them. The-universal practice of all locomotive builders is to use the 234x234 mesh in extension fronts. -He says he has run locomotives equipped' with the three and one-half mesh and with two and one-half mesh,, and the latter throws out no more sparks than the former. Under-the same condition the two throw out about the same size of sparks. Ninety-two per cent, of the locomotives built by the Brooks Locomotive Works were equipped with the two and one-half netting. This size of mesh was in general use and approved by the railroads. Experience must have demonstrated its efficiency. This particular mesh is in general use on many of the largest railroads, and the testimony is that it arrests sparks about as well as any other. Railroads, it may be assumed, adopt appliances which will protect them from liability. Railroads using appliances in common use, which have-been used for a long time and found sufficient to protect their own and other property from danger, should, as a general rule, be protected against- the charge of negligence because of its use. If such-appliances are used the burden of proof is on plaintiff to show that they were defective, or improperly and negligently used.
*1183 In the case of V. & A. Meyer vs. Railroad Company, 41 An. 610, we held that when an engine was properly equipped with effective apr plianees to prevent the escape of sparks the burden of proof is shifted to the plaintiff, and the testimony must be very strong and convincing to establish negligence on the part of the defendant company. In this case the strong and convincing testimony is wanting.
It is unnecessary to pursue this discussion further, as we have concluded that the testimony does not show with reasonable certainty that the fire originated from sparks emitted from the engine No. 109 belonging to and operated by the defendant company on the morning of the fire. A few sparks were emitted, as stated by the witness Ballard, and he says he did not see them go on the cotton, but only in its direction. The fact that the cotton was set on fire by the sparks is inferred from his statement that the fire originated twenty minutes after the engine passed.
The witness Ballard testified as follows: That engine No. 109 was coming down town about half past 8 or 9 o’clock, and was running at the rate of six miles an hour with the tender in front. As the engine was passing a curve it gave a jerk, and “ looked like she sorter threw her wheel off, and the engineer gave it one or two revolutions and the engine went on down the river.” When the engine jumped the track with one wheel off, the engineer “ pulled out his throttle” and the engine only stopped a second and went on. It was this “jostle” or jump which caused the smoke and sparks to be emitted, few in number, but the size of his little finger. He says the wind was blowing toward the cotton. He did not see any of the sparks go on the cotton, because the engine was between him and the cotton. It was ten or fifteen minutes after the engine passed that he saw the fire on top of the cotton next to the Fire Proof Press. This press was located at the corner of Race and South Front street. The cotton was piled on Race street in front of the banquette and alongside of the Fire Proof Press. It was in two sections with an interval of some feet separating the two piles. The Belt Road over which the engine was run the morning of the fire is located along Front street, and a spur track runs from about the centre of Race street into the gas yard. Where the spur track joins the Belt Road there is a frog, and it is at this point where the engine is said to have jumped the track and emitted the sparks. The *1184 witness locates himself at the coal office of Coyle at 6 a. M., where he remained until he saw the fire.
Next to Ballard the plaintiff relies upon the testimony of one H. A. McGregor, who states that about 9:80 a. m. he reached the river front, having passed the cotton in which he saw no signs of Are. When at the river front he saw the fire in the second tier, about the second bale from the end on the side of the cotton just below the tarpaulins. The important part of his testimony is as to the time of the fire, corroborating that of the witness Ballard. The time that the cotton-ignited after the passing of the engine is important. These-witnesses fix the time at about twenty minutes after the passage of engine No. 109. Without referring in detail to the testimony on this point, we think it satisfactorily proved by the train men operating the engine that the engine Noi 109 passed early in the morning, say at 7:80 A. m., and it was several hours before the fire was discovered after the engine had passed. With the wind blowing at the rate' and in the direction which the witness Ballard gives it, it is incredible to suppose that after the sparks, the size of his little finger, had fallen on the cotton it would have taken this length of time to ignite. Much stress, too, is laid upon the testimony of several witnesses that the track was rough and in bad condition at the part where the witness Ballard says that the engine went off the track with one wheel, and by giving additional impetus to it, by applying more steam, the engine gained the track and proceeded on its way.
But these witnesses go no further than to say the track, at that point, where there are several rails, is in bad condition, giving the engine a lurch forward toward the frog.. The testimony of the engineer and others in charge of the train deny that any such thing occurred as described by Ballard. Our experience alone tells us that it is impossible for an engine to have one wheel off the track, and by giving additional speed to it, to place the wheel again on the rails. The fact testified to by Ballard was, no doubt, that which was observed by the witness Williams, who saw an engine pass over the same track. He says that there was a decided apparent unsteadiness in the wheels and a lurch of the locomotive to the side of the frog. This unusual jolt or lurch was not such as would have attracted his attention unless he had been looking at the wheels of the locomotive, when he certainly would have noticed it. We do not think *1185 there was in the passage of the engine over this track such a condition as to require the extraordinary exertion, described by Ballard to get the engine on the track and to cause the unusual emitting of sparks the size of his little finger. That Ballard was mistaken we think there is little doubt. His statement as to the time of the passage of the engine is disproved, as well as the make-up of the train. Where his testimony is corroborated by one witness it is disproved by many others. The cotton was only partially covered by tarpaulins, and along the pile of cotton it was possible for it to be ignited at several points. On the contention as to what particular part in the pile the fire occurred there is a conflict of testimony. It is on top near the end of the pile to Front street; again, it is at the bottom, and again in the pile separated from the pile nearest Front street near the opening between the two piles — in an entirely different locality described by Ballard. Nobody seemed to know the origin of the fire. Nine months elapsed before it was discovered that engine No. 109 set fire to the cotton.
An officer whose duty it was to report the fact officially stated, as a theory, it was ignited by a cigarette. The cotton was unprotected by efficient police, and it was not practical to notice who passed by it. It was in a public place, on a public street, and persons could go by it unobserved between the fire press and the cotton. It was as probable that the fire originated by the careless handling of the pipe, cigar or cigarette, as by sparks from the locomotive.
One of plaintiff’s witnesses says he left his house at half past nine o’clock, and lit a cigarette, and passed by the pile of cotton on his way to the river. He had passed the cotton about a half a square when he heard the alarm of fire. He does not state that he was smoking when he passed the cotton, but as the habit of cigarette smoking is universal, inveterate and continuous, it may be that others also passed and may have indulged in the habit.
The mass of testimony is conflicting in some particulars, but we think the preponderance is that the engine No. 109 passed the pile of cotton several hours before the fire was discovered; that anthracite coal was used, from which no black smoke could have issued, in which the sparks could be seen, and that the engine was so equipped with a spark arrester that it is not probable that sparks of sufficient size could have been emitted that would live more than thirty or forty feet beyond the smoke-stack, and it is not probable that *1186 sparks of the size described by the witness Ballard were emitted from the defendant’s engine, and the testimony does not convince us that the fire originated from sparks arrested from the locomotive of defendant’s train.
Judgment affirmed.